Filed 6/12/14  P. v. Herring CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LESHAUN IVY HERRING,<br><br>Defendant and Appellant. | F065167<br><br>(Super. Ct. No. 12CM0511)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Louis F. Bissig, Judge.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

Leshaun[1] Ivy Herring beat his girlfriend with his fists and threatened her and friends who tried to help her. He was convicted of assault by means of force likely to cause great bodily injury, willful infliction of corporal injury on a cohabitant, and two counts of making criminal threats.

In this appeal, Herring contends that his counsel should have requested the replacement of two jurors or a mistrial, or the trial court should have replaced those jurors or declared a mistrial on its own motion. The victim, Michele Gonzales, had approached the two jurors and spoken to them outside the courtroom. Herring also argues that the evidence was insufficient to support the convictions of making criminal threats and that the court was required to give the jury a unanimity instruction on one of the criminal-threat counts. Further, Herring maintains that the court's findings that he served two prior prison terms (on which sentence enhancements were based) were erroneous because there was insufficient evidence that he was the person named in the records presented to the court. We reject each of these contentions.

Both parties state that there are two clerical errors in the abstract of judgment. Our examination of the record confirms only one of these. We will order it corrected and otherwise affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Around 1:00 a.m. on February 19, 2012, police were dispatched to the apartment shared by Herring and Gonzales in Lemoore. Gonzales had fresh injuries on her face. She was taken to a hospital, where she told an officer that Herring had grabbed her by the neck, pushed her into a closet, and punched her in the face until she lost consciousness. Herring threatened to kill Gonzales. He also threatened Gonzales's friends Tristan

---

[1]Herring's first name is spelled variously throughout the appellate record as "Leshaun" and "Lashaun." In a handwritten letter to the court that is attached to the probation report, Herring spelled it "Leshaun."

Thomas and Matthew Mayhew as they helped Gonzales get to a car to be taken to the hospital.

The district attorney filed an information charging Herring with five counts: (1) assault by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4));[2] (2) willful infliction of corporal injury on a spouse or cohabitant (§ 273.5, subd. (a)); (3) making a criminal threat against Gonzales (§ 422); (4) making a criminal threat against Thomas (*ibid.*); and (5) false imprisonment (§ 236). For purposes of sentence enhancement, the information also alleged that Herring had inflicted great bodily injury in counts 1, 2, and 5 (§ 12022.7, subd. (e)) and had served two prior prison terms (§ 667.5). On the second day of trial, the court granted a defense motion to dismiss count 5.

At trial, Sergeant Patrick Mundy of the Lemoore Police Department testified that when he met Gonzales at the apartment, the bruises on her face developed before his eyes. "They went from flesh tone and red to gray and purple like a Polaroid."

Officer Jose Ambriz testified that he interviewed Gonzales at the hospital the same night. She told him the incident began in the bedroom when she saw a wallet in Herring's pants pocket. He did not usually carry a wallet in his pocket and she took it out to look at it. It was not Herring's wallet and it contained a picture identification of a neighbor. Gonzales was upset and accused Herring of stealing it. Herring reacted by grabbing Gonzales around the neck and throwing her into a closet. Gonzales called out to her daughter, Marisa Gonzales. Herring grabbed Gonzales, but let her go when Marisa entered the room. They all went into the kitchen, but Herring persuaded Gonzales to go back to the bedroom to talk. Herring locked the door.

Gonzales went into the bathroom to inspect her injured neck in the mirror. Herring came up behind her and said, "We're similar .… You're my girl; if not, you're

---

[2]Subsequent statutory references are to the Penal Code unless otherwise indicated.

dead." Gonzales was afraid when Herring said this; she believed he carried a gun. She was afraid for herself, her daughter Marisa, and her grandson. Then Herring grabbed Gonzales and threw her into the shower wall, causing her to fall. She got up and made for the door, but Herring blocked her, pinned her against the shower wall, and punched her. He punched her three times and she lost consciousness. When she came to, she was in a car belonging to Marisa's friend, Trish Martinho. She told Martinho to stop the car because she thought Herring had a gun and Marisa and the grandson were still in the apartment.

Officer Ambriz also saw Herring at the hospital that night. Herring was hospitalized because, after he attacked Gonzales, Marisa's friends Matthew Mayhew and Tristan Thomas beat Herring. Ambriz had not spoken to Herring, but Herring asked him to come closer so he could say something. Herring said, "Look into my eyes, that bitch tripping on me. I'll kill her, nigga."

Marisa testified that when her mother called for her from the bedroom, she tried to open the door, but it was locked. After Marisa's repeated entreaties, Herring unlocked the door. Marisa entered the bedroom and saw her mother lying in the closet with her legs protruding. Gonzales yelled to Marisa to tell Herring to leave. Gonzales had red scratches on her neck. Gonzales and Herring went into the kitchen and then returned to the bedroom after Herring promised he would leave if Gonzales would talk to him. After 10 or 15 minutes of silence, Marisa became concerned, knocked on the door and told Herring to open it. Herring refused. After Marisa called to Mayhew to kick down the door, Herring opened it. Marisa saw Gonzales crawling on the floor; Marisa told Herring he needed to leave. Blood was dripping from her mother's mouth and was on the carpet. Mayhew picked Gonzales up and carried her, limp and unresponsive, to his car. Mayhew placed her in the car and told Martinho to drive her to the hospital. Herring followed them out to the car and told them not to take Gonzales to the hospital. He tried to get Gonzales out of the car, but Mayhew prevented this. Herring then tried to go back inside,

but Thomas blocked his way. After Herring forced his way past Thomas, Mayhew and Thomas beat Herring up inside the apartment. Thomas hit Herring on the head with a crutch. Marisa called the police. By the time the police arrived, Gonzales (having gotten out of the car before she could be taken to the hospital) was back at the apartment. On cross-examination, Marisa testified that Herring and Gonzales had had a lot to drink that night, and Gonzales, at least, was drunk. Marisa also testified, "I know how my mom is when she's drinking and she likes to fight."

Martinho testified and confirmed many of the main points of the incident as described by Marisa and by Gonzales's statement to Officer Ambriz. Martinho stated that Gonzales and Herring were in the bedroom when Gonzales called for help. Mayhew prepared to break down the door. Later, Mayhew carried Gonzales, injured, to the car. Martinho described Gonzales's split lip and swollen eye. She heard Herring object to Gonzales being taken to the hospital and saw him advancing to take her out of the car, but Mayhew stood between Herring and the car and stopped him. As Martinho began driving away, Gonzales regained consciousness and insisted on returning to the apartment because she feared Herring would harm Marisa and the grandson.

Mayhew's testimony also corroborated Gonzales's statement to Officer Ambriz. Mayhew related that Herring and Gonzales were in the bedroom when Mayhew heard screaming. He, Thomas, and Martinho ran to the door and Mayhew was about to kick it down when it opened. Gonzales was on all fours in a pool of blood, her "lip was ripped open," and her eye was swollen shut. When he carried her to the car, she was unconscious. Herring followed him outside and challenged him to fight. After Mayhew placed Gonzales in the car, Herring tried to approach the car, and Mayhew pushed him back. Herring said, "I'll bang you," which Mayhew understood as a threat to shoot him. Mayhew did not think Herring would shoot him, since he was not holding a gun, but Mayhew was worried about getting Gonzales and his infant son (who had been present throughout the evening) away from the apartment. After Martinho drove away, Mayhew

5.

returned to the apartment and Marisa closed the door.  He saw Herring talking to Thomas outside.  Thomas said, "You don't want these problems," and Herring walked away.  Thomas then entered the apartment and handed Mayhew a crutch.  Herring returned and struggled with Thomas to get past the door and into the apartment.  As he struggled with Thomas, Herring said he was getting ready to fight Mayhew, and Mayhew feared for his safety.  Mayhew threw the crutch.  Herring succeeded in forcing his way through the door.  Thomas struck him in the forehead with the other crutch.  Thomas then fell over a couch.  Seeing Thomas fall, Mayhew became angry and punched Herring many times.  Finally, as Marisa was on the phone with the police, Mayhew and Thomas ran from the apartment to Thomas's car and drove away.

Thomas testified that Mayhew called him on the phone around 1:00 a.m. and said someone was attacking Gonzales.  Thomas went to the apartment and soon heard a scream from the bedroom.  He and the others yelled for Herring to open the door, which he did after a time.  He observed Gonzales in the bathroom "bleeding and in a puddle of blood."  She was lying on the floor and "looked dead."  Mayhew picked her up and headed out of the apartment toward the car.  Herring followed, telling Mayhew not to put Gonzales in the car and threatening to hit, beat, and shoot him.  After the car drove away, Thomas and Mayhew went back into the apartment.  Thomas found a pair of crutches, one inside the apartment and one outside.  He gave one to Mayhew.  Herring began to force his way back into the apartment.  He shoved the door open as Thomas tried to keep it closed.  Thomas told Herring he could not come in.  Herring said, "You can get it, too," and "I'll beat your ass, too."  The prosecutor asked if Thomas understood this as a threat to fight.  Thomas replied:

> "Yeah.  Like I said, pretty much like this:  When he made a threat that he'll get me too and I heard all this rustling around in the house—I done been shot before, I'm real paranoid.  You done told me you're going to do something to me and you already supposedly did something already.  I'm paranoid, I fixing to attack you."

Thomas had been told that Herring had a knife and possibly a gun. When asked whether he was in fear for his life, he answered:

> "I was in fear for everybody at that point, to be for real, because it was mostly women. And, [Mayhew] seemed like he was more scared than anything. I came to help get them out of there and go back home but it didn't turn out like that."

When Herring shoved the door open, he pushed Thomas against the wall with enough force to make a hole in the wall. Thomas hit Herring on the top of the head with a crutch. Thomas fell after swinging the crutch. When he got up, he joined Mayhew in punching Herring. Thomas and Mayhew then left the apartment.

When Gonzales testified, she claimed she did not remember any of the statements she made to Officer Ambriz and provided a version of events exculpating Herring. She related that he did not hit, punch, grab or throw her that night, and in fact had never hit her on any occasion. She had consumed beer and whisky and taken pain killers that evening and described herself as being highly intoxicated. Gonzales and Herring had been "partying" with the others, but then Herring went to sleep and "wouldn't get up and party anymore." This made Gonzales angry and disappointed. "I never can control my anger even when I'm not drunk," she testified, and the alcohol and pain killers made her even "meaner and madder." Consequently, to wake Herring up, Gonzales punched him in the forehead and chest as hard as she could. When he awoke, Herring pushed her and she fell, landing on the floor in the closet. She called for Marisa. Herring took her arm and tried to help her up, but she told him to get away. She went into the kitchen and Herring followed. Gonzales was angry that Herring had pushed her, but Herring was "kind of like in a shocked state" and did not know what was happening because he had been asleep.

Gonzales continued to relate that they went back to the bedroom to talk. Gonzales was walking into the bathroom when she tripped over a nightstand. She fell and hit her face on the bathroom counter. Herring helped her get up, but she pulled away and fell

7.

again, again hitting her face on the counter.  She got up again but was dizzy.  Herring tried to hold her up and steady her.  She again pulled away from him.  She spun around and caught her lip on the shower door handle, tearing the lip.  Then she fell again and hit her face on a step stool inside the shower.  She crawled out of the shower and called for Marisa.

When asked to explain a photograph of injuries to her arm, Gonzales replied that she sustained them when Herring was holding her and she pulled away from him, thus causing his nails to catch on her skin.  She said she bruised easily because she was anemic and her arms were always bruised.  Gonzales explained a photograph of injuries to her hand by saying it became swollen after she punched Herring in the head.

Gonzales admitted that she gave a different version of events to police, but maintained that she did not remember who the officer was, where the interview took place, or what she said.  Gonzales asserted that she never believed Herring was going to hurt her, her daughter, or her grandson.

The prosecutor asked Gonzales whether she remembered an interview two months before the trial at which she, the prosecutor, and an investigator for the district attorney's office were present.  She did.  She admitted that, during this interview, she had said she did not know how she got her injuries.  She said she made that statement because she was afraid of being accused of making a false police report.  When asked why she was afraid of this possible accusation in view of her lack of memory of her report to the police, she replied that her daughter had told her what she reported.

Gonzales confirmed that she called the district attorney's office on two or three occasions and asked that the charges against Herring be dropped.  She made the same request during two meetings with the prosecutor.

Marisa testified that, before Herring knocked Gonzales out, Gonzales was not bumping into things, stumbling, tripping, or having trouble with her balance.  Marisa confirmed that her mother bruises easily.

The jury found Herring guilty of counts 1 through 4 and found the great-bodily-injury allegations true. The prior-prison-term allegations were found true by the court. The court imposed a prison sentence of 12 years 4 months, calculated as follows: On count 2, the upper term of four years, plus five years, consecutive, for the great-bodily-injury enhancement; on count 3, eight months, equal to one-third of the middle term; on count 4, eight months, equal to one-third of the middle term; and two years for two prior-prison-term enhancements. The sentence on count 1 was stayed under section 654.

## DISCUSSION

### I. Witness-juror contact

At the end of the day on May 8, the first day of trial, juror No. 114159 stayed behind to address the court. The juror said:

> "I just wanted to let everybody know that the witness Michele Gonzales she was out speaking to us earlier or kind of publicly saying, 'Oh, you guys are—this is my case. This is our—You're going to be on the jury for my case.' And, in the bathroom I saw her, also, and she said, 'This is my case.' And, I said, 'No, we're already in the courtroom, it's somebody else.' And, she said, 'No, it's me.' I said, 'Oh, you're the one?' And, she said, 'Yeah.' And, then I just went to the bathroom stall. Oh, she said, 'Yeah, I had a fight with my boyfriend.' And, I went in the bathroom stall and I didn't speak to her anymore."

This happened during the lunch break, while jury selection was in progress.

The court asked whether hearing these comments was "going to have any impact on how you would evaluate her testimony or anything to do with the case or is it something you can disregard …." The juror replied, "Yeah, I think I can disregard it."

The court asked whether Gonzales was speaking loudly enough to be heard by others. The juror replied that there were other people nearby, both outside the courtroom and in the bathroom, and that some of them likely could hear.

The court excused the juror for the evening and called Gonzales into the courtroom to question her on this issue, reminding her she was under oath. At first, Gonzales denied any recollection of whether she had spoken to any juror. Then she

admitted that, in the presence of some jurors, she said "that I'm the person that they're going to be in court with." When questioned by counsel, Gonzales admitted she told someone the case was about a fight she had with her boyfriend, but claimed she was speaking to a friend who happened to be on jury duty in another case. After denying any recollection about whether she said anything in the bathroom, Gonzales said she spoke to Marisa about the case there, only mentioning that the jurors in the area were there for Herring's case. She denied speaking directly to anyone else. She said there were four or five people in the bathroom when she was speaking to Marisa and about 30 in the lobby when she was speaking to her friend. The court ordered Gonzales not to have any contact with the jurors or with any witnesses, including Marisa.

The following day, the court asked all the jurors whether they had heard Gonzales saying anything outside the courtroom. Juror No. 118838 raised her hand. The court excused the remaining jurors in order to question juror No. 118838 separately.

Juror No. 118838 testified that she had a conversation with Gonzales. Gonzales asked the juror whether all the people in the room were prospective jurors on the case. The juror responded affirmatively. Gonzales then said, "I'm the victim." The juror stopped speaking to Gonzales at that point. The court asked whether the conversation would "have any impact one way or the other on how you might approach the case, evaluate her testimony, or determine any issues in the case?" The juror answered, "No, the conversation was very brief." Asked whether she mentioned what happened to any other juror, the juror said she told a woman who "wasn't picked for the jury" that she did not know whether Gonzales should be there, since she was the victim. Neither juror No. 114159 nor juror No. 118838 was excused and no party asked for either juror to be excused.

Herring maintains that the facts reported by the two jurors amounted to juror misconduct. It was misconduct, he contends, despite the lack of fault on the jurors' part, because Gonzales's statements caused a "substantial likelihood of juror bias." (*In re*

10.

*Carpenter* (1995) 9 Cal.4th 634, 653.) In other words, Gonzales undermined Herring's defense—i.e., the contention, based on Gonzales's testimony, that he never hit her—by saying she was the victim and that they had a fight. Herring further argues that his trial counsel rendered ineffective assistance when he failed to move for a mistrial or for replacement of the two jurors by alternates.

To establish ineffective assistance of counsel, a defendant must show that counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; see also *People v. Hester* (2000) 22 Cal.4th 290, 296.) It is not necessary to determine whether counsel's challenged action was professionally unreasonable in every case. If the reviewing court can resolve the ineffective-assistance claim by proceeding directly to the issue of prejudice—i.e., the issue of whether there is a reasonable probability that the outcome would have been different absent counsel's challenged actions or omissions—it may do so. (*Strickland v. Washington, supra*, at p. 697.)

In this case, there is no reasonable probability that Herring would have obtained a more favorable outcome if the jurors who heard Gonzales's remarks had not served. Even without the remarks she made to the jurors, Gonzales was a severely compromised witness. All the other witnesses who testified about what happened that night—Marisa, Officer Ambriz, Martinho, Mayhew, and Thomas—gave consistent accounts that contradicted Gonzales's version. No motive for these witnesses to lie appears in the record. Gonzales's version was itself wildly implausible. It also was the third of three accounts she gave: first, to Officer Ambriz, that Herring assaulted her; second, to the district attorney's office, that she had no memory of how she got injured; and third, at trial, that she fell and hit her face on various objects numerous times. In sum, the evidence presented in court that Gonzales was lying to protect Herring was

11.

overwhelming, and there is no reasonable probability that her remarks to jurors outside the courtroom made any difference.

Herring also argues that, even if there was no ineffective assistance of counsel, the trial court erred when it did not replace the two jurors with alternates or declare a mistrial on its own motion on grounds of juror misconduct. As we will explain, any possible error on the court's part was harmless.

A juror's receipt of information about a case from extraneous sources is presumed to be prejudicial, but this presumption is rebutted where the record as a whole shows there was no prejudice. (*In re Carpenter, supra*, 9 Cal.4th at p. 653.) The record must establish the following: First, the record must show that the nature of the extraneous material is such that, under the totality of the circumstances, it is not substantially likely to have influenced the juror. Second, and apart from the inherent nature of the extraneous material, the record must show an absence of circumstances surrounding the receipt of the extraneous material that would indicate a substantial likelihood that the juror who received the material was actually biased. (*Id*. at pp. 653-654.)

We will assume for the sake of argument that the jurors' hearing of Gonzales's out-of-court remarks was improper and that a presumption of prejudice arises from it. For the reasons stated in our discussion, *ante*, regarding ineffective assistance of counsel, the presumption has been rebutted. In light of the overwhelming evidence discrediting Gonzales's version of events, the extraneous information is not substantially likely in its inherent nature to have influenced any juror. The same quantum of evidence, together with the absence of any circumstances tending to indicate bias, shows that there is no substantial likelihood that any juror was actually biased.

## II.   *Sufficiency of evidence of criminal threats*

Herring asserts that the evidence was not sufficient to support the convictions of making criminal threats in counts 3 and 4. The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well established:

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] … We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

To establish a violation of section 422, the prosecution must prove five elements: (1) the defendant willfully threatened to commit a crime that would result in death or great bodily injury; (2) the defendant made the threat with the specific intent that it be taken as a threat, with or without an intent to carry it out; (3) the threat was "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution" (§ 422, subd. (a)); (4) the threat caused the victim to be in sustained fear for his or his immediate family's safety; and (5) the victim's fear was reasonable. (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)[3]

---

[3]Section 422, subdivision (a), provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

13.

On count 3, the threat against Gonzales, Herring maintains that the evidence was insufficient to establish the third element. He does not challenge the sufficiency of the evidence of the other elements.

Herring first contends the threat was not "unconditional" because he told Gonzales, "You're my girl; *if not*, you're dead." (Italics added.) Herring acknowledges, however, that section 422 cannot be understood to include a requirement that a threat be absolutely unconditional, since some degree of conditionality is inherent in the nature of threats generally. As a rule, a threatener makes a threat to do harm *unless* some demand is satisfied. (*People v. Bolin* (1998) 18 Cal.4th 297, 339.) Therefore, the reference to unconditionality in section 422 prohibits only "'prosecution based on threats whose conditions preclud[e] them from conveying a gravity of purpose and imminent prospect of execution.'" (*Bolin, supra,* at p. 339.)

The condition in this case did not prevent it from conveying to Gonzales a gravity of purpose and imminent prospect of execution. Minutes before making the threat, Herring grabbed Gonzales by the neck and threw her into a closet. When he made it, the bedroom door was locked and Gonzales believed Herring had a gun. Immediately after making the threat, Herring beat Gonzales unconscious. The jury could readily conclude that Herring made the threat under circumstances of great tension and menace to Gonzales.

Herring also claims the threat did not convey a gravity of purpose and immediate prospect of execution because it is not clear what he might have meant by saying Gonzales was dead if she was not "my girl." The jury, however, could reasonably find that Herring meant what the words appear on their face to mean: he would kill her if, because of the violent behavior he had just displayed, she ended their relationship. Herring's contention that his threat was "vague and nonspecific" and "effectively meaningless" is without merit.

Herring's reliance on *In re Ricky T.* (2001) 87 Cal.App.4th 1132 is unavailing.  In that case, a high school student became angry at a teacher when the teacher accidently hit him with a door when opening it.  The student said, "'I'm going to get you'" and "'kick your ass.'"  (*Id.* at pp. 1135-1136.)  The Court of Appeal held that, in context, this threat lacked indications of a gravity of purpose.  (*Id.* at p. 1138.)  The contrast is stark between that context and the context of the threat in count 3 in this case.  There, the threat was made in a public place after a minor accident with no indications of violent behavior by the defendant toward the teacher at any time or any history of quarrels between them.  (*Ibid.*)  Here, the threat was made behind a locked door in the midst of a series of acts found to have caused great bodily injury.

For all these reasons, we conclude Herring has not shown that the evidence failed to establish count 3.

Herring next argues that the evidence was insufficient to support count 4, the threat against Thomas.  While struggling with Thomas to re-enter the apartment, Herring told Thomas, "You can get it, too," and "I'll beat your ass, too."

Herring argues, first, that the evidence did not support element No. (4), sustained fear on the part of the victim for his or his family's safety.  He contends Thomas must have been unafraid since, after Herring forced his way past the door, Herring was outnumbered and quickly overpowered by Thomas and Mayhew.  Herring adds that, like the threat in *Ricky T.*, his threat to Thomas was "nothing more than a vague threat without the prospect of immediate execution," thus challenging the sufficiency of evidence to support element No. (3) as well.

The evidence was sufficient to establish both element No. (3) and element No. (4). After inflicting serious injuries on Gonzales, Herring followed Mayhew and Thomas outside, shouting abuse and threats at them.  He then forced his way back into the apartment, and in the process shoved Thomas against a wall with such force that Thomas's body made a hole in the wall.  While doing this, Herring said Thomas would

15.

"get it" and he would "beat [Thomas's] ass." Thomas related that he was "in fear for everybody" while these events were happening. Based on this evidence, the jury could reasonably find that Herring's threat to Thomas was "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution" (§ 422, subd. (a)), for Herring not only issued the threat, but was attempting, with some success, to carry it out. The jury also could reasonably find that Thomas was in sustained fear for himself, for he said he was afraid for "everybody." The circumstances justified his fear. The fact that Thomas and Mayhew subsequently won the fight that Herring began does not show that Herring's threats and accompanying violent behavior were not frightening or nonserious.

## III. *Unanimity instruction*

Herring argues that the trial court was required to give the jury a unanimity instruction on count 4, the threat to Thomas. Under the California Constitution, a conviction by jury verdict is valid only if the jurors unanimously find the defendant committed a specific offense. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*)

In Herring's view, the evidence in this case suggested two discrete crimes that the jury could have considered when deliberating on count 4: Herring's threats against Thomas and Herring's threats against Mayhew. The defect in this theory is, as the People point out, the jury was instructed that, to find Herring guilty on counts 3 and 4, it had to find threats against Gonzales and Thomas. It was not given the option of returning a guilty verdict based on threats directed against Mayhew. The evidence did not suggest more than one discrete crime *against Thomas*, and the jury could not rationally find a threat against Thomas based on Herring's statements to Mayhew. There was no evidence that Thomas understood those statements to be directed toward him as well.

16.

Herring argues that, in spite of this, a unanimity instruction was required because the prosecutor's remarks in her closing argument could have been construed to be suggesting that the threats against Mayhew were also against Thomas. Herring quotes the following portion of the prosecutor's closing argument:

> "And, as [Mayhew] is carrying [Gonzales] lifeless, unconscious, twitching down the hallway the defendant is following [Thomas] and [Mayhew] trying to stop them from taking her to the hospital. Trying to stop them from giving her medical care that she so obviously and desperately needs. Is this the concerned boyfriend? Is this the man that cares? Or is he a brutal attacker that caused her to be lifeless, bleeding, unresponsive in that bathroom?

> "And, as [Mayhew] is carrying [Gonzales] on his shoulder [Herring's] stopping him. He's trying to get involved. [Thomas] is running interference. [Herring's] threatening [Mayhew]. He's saying, 'I'm going to bang you. Throw your hands. Don't take her to the hospital.' And, even after [Mayhew] gets her in the car she's still unconscious, folks. She's still bleeding. [Herring's] trying to get at the car to get her out. Concerned boyfriend. Big man.

> "[Martinho] drive[s] away. She understands danger, as well as [Mayhew] and [Thomas] because they know they're in danger now, too. The defendant, all of a sudden, turns his attention towards [Mayhew] and [Thomas]. They know that they need to get the defendant out. That's why [Thomas] slammed the door. That's why Marisa said, 'Lock the door,' because we understand danger is going on. The threat isn't gone."

We do not see how these remarks implied that the jury could find Herring guilty of threatening Thomas based on threats made against Mayhew. As part of her refutation of the defense claim that Herring did not attack Gonzales and was instead trying to help her, the prosecutor in these remarks pointed out that Herring behaved threateningly and then violently toward those who really were helping Gonzales. This did not imply that the jury could find Herring guilty of threatening Thomas because he threatened Mayhew.

## IV.  *Prior-prison-term findings*

Herring asserts that the records provided to the court did not contain sufficient evidence that he had served the two prior prison terms necessary to support the

section 667.5 sentence enhancements.  Specifically, it is argued that the evidence did not establish that he is the same Leshaun Herring as the person described in the records.  We disagree.

In precisely this context—the identification of a defendant as the person named in records of prior convictions—the Court of Appeal has observed that "[i]t has long … been the rule in California, in the absence of countervailing evidence, that *identity of person may be presumed, or inferred, from identity of name*."  (*People v. Mendoza* (1986) 183 Cal.App.3d 390, 401.)  This rule controls here.

The prosecution presented two sets of records to the trial court.  The first set showed that on April 4, 2006, in Sacramento County, Leshaun Herring was committed to prison for five years four months on charges of possessing or purchasing cocaine, evading police, and possessing a firearm as a convicted felon.  The second set showed that on April 22, 2010, in Yolo County, Leshaun Ivy Herring was committed to prison for three years for possessing a controlled substance for sale.  There is no material countervailing evidence that the Leshaun Ivy Herring in this case is a different person.

Herring argues that there is countervailing evidence in the form of slight discrepancies in the dates of birth shown in several places.  The abstract of judgment from Yolo County gives the date of birth of the defendant in that case as April 2, 1984.  The abstract of judgment from Sacramento County gives the defendant's date of birth as April 3, 1984.  Four minute orders in the packet of records from Sacramento County also give the date of birth as April 3, 1984, as does the probation report in this case.  The trial court stated that a document in its own file, a protective order, showed Herring's date of birth as April 3, 1984.  A document in the Yolo County packet, which records a no-contest plea entered by the defendant in that case, states a date of birth of April 3, 1984.

The trial court also said, "There is other reference in the Yolo County records to a birth date of April 4th, which is consistent with the current information we have."  The

court appears to have misspoken, as the date April 4, 1984, does not appear in the Yolo County records or elsewhere in the appellate record.

These discrepancies do not amount to countervailing evidence of any significance. All records—those from Sacramento County and Yolo County and those in the present case—contain a date of birth for Leshaun Herring of April 3, 1984. Only the abstract of judgment from Yolo County and the trial court's apparent misstatement refer to different dates, and those dates differ from April 3, 1984, by only one day.

Herring also points out that the records of his prior prison terms do not contain photographs, fingerprints, or physical descriptions. This additional identifying information is not necessary. The identity of names is sufficient. Even if not, the evidence of the date of birth, despite the slight discrepancies mentioned above, would in combination with the identity of names enable a rational finder of fact to make the necessary findings.

Finally, Herring contends the absence of documents in the appellate record explaining the trial court's reference to April 4, 1984, requires reversal because it denies him the right to a meaningful appeal. We disagree. It is overwhelmingly likely that the trial court simply misspoke. Even if there were documents indicating a date of birth of April 4, 1984, we would not consider the discrepancy material, just as we do not consider the existence of a document showing April 2, 1984, to be a material discrepancy.

## V. *Clerical errors*

The parties both state that the abstract of judgment contains two clerical errors that we should order corrected. Having compared the abstract with the court's oral pronouncement of sentence, we agree regarding only one of the claimed errors.

The parties correctly observe that the abstract of judgment erroneously describes the offense in count 1, a violation of section 245, subdivision (a)(4), as "assault causing GBI in domestic violence." Section 245, subdivision (a)(4), does not include a "domestic violence" element. We will order this error corrected.

The parties also maintain that the abstract is erroneous because it shows the court imposed a two-year section 667.5 enhancement for two prior prison terms in connection with count 2, and shows that the section 667.5 enhancement for count 1 was stayed. The parties assert that the court intended to impose one-year enhancements on each of these counts and not to stay either enhancement.

The record of the sentencing hearing does not support this assertion. The court stated that it was imposing two years under section 667.5 for count 2 and was staying both the underlying sentence and all enhancements for count 1. The abstract is correct in this respect.

### *DISPOSITION*

The trial court is directed to amend the abstract of judgment to delete the words "in domestic violence" from the description of the offense in count 1. The trial court will forward the amended abstract to the appropriate correctional authorities. The judgment is affirmed in all other respects.

_____
Sarkisian, J.*

WE CONCUR:


_____
Poochigian, Acting P.J.


_____
Peña, J.

---

*Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.